UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| LUIS ROBERTO CAMPOS,<br><br>    Plaintiff,<br><br>    v.<br><br>KIM HOLLAND,<br><br>    Defendant. | Case No. 15-CV-00856-LHK<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

Before the Court is Petitioner Luis Campos' ("Petitioner") Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. ("Pet.") ECF No. 1. The Court ordered Respondent Kim Holland ("Respondent") to show cause why Campos' Petition should not be granted. ECF No. 10. Respondent filed an Answer addressing the merits of the Petition, ("Answer") ECF No. 16, and Petitioner filed a Traverse, ("Traverse") ECF No. 18. Having reviewed the briefs and the underlying record, the Court concludes that Petitioner is not entitled to relief based on the claim presented, and DENIES the petition.

**I.    BACKGROUND**

    **A.  Factual Background**

Federal courts reviewing habeas petitions must presume that the state courts' factual

determinations are correct unless that presumption is rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Accordingly, the facts in this case are drawn from the opinion of the California Court of Appeal. *See* Answer Ex. 6 ("CCA Op.").[1]

> Doe I is defendant's niece. When she turned 13 in early 2007, she moved from El Salvador to Portland, Oregon, to live with her father, H.C. Near the end of July 2007, Doe I traveled to the Bay Area to visit her uncle[s], Oscar C. and defendant, and her grandmother, who lived with defendant.
>
> Defendant was the [co-owner] of Casa Chicas, a business that distributed chips and salsa. Oscar C. worked for him. Doe I had known her Uncle Oscar for a long time and considered him like a father.
>
> During the visit to the Bay Area which lasted two weeks, Doe I took a trip to Disneyland and Las Vegas with defendant, his wife Cristina, and their two-year-old son. Since Cristina drove most of the trip, defendant sat in the backseat of the truck with Doe I. On the trip, he touched Doe I's breasts. In Las Vegas, defendant tried to molest Doe I in their hotel room, but he stopped when Doe I protested. He told Doe I not to tell anyone because her grandmother was very sick and disclosure would make her worse.
>
> When the family returned to the Bay Area, Doe I went to sleep in her room. Defendant came into the room and fondled her breasts and crotch. Doe I struggled and defendant stopped when his wife knocked on the door.
>
> Days later, defendant asked Doe I to take a trip to his warehouse. On the way, he took her to a motel. He took off her clothes in the room and kissed her breasts, engaged in oral copulation in Doe I's mouth, and penetrated her anus and vagina. Defendant warned Doe I not to tell anyone because it would make her grandmother ill. He also indicated he would fire her Uncle Oscar if she reported the conduct. Defendant told her he had lots of money and power and that he was immune from prosecution.

---

[1] Although Petitioner does not argue in his Petition that the California Court of Appeal's decision was based on an unreasonable determination of the facts nor that Petitioner is factually innocent, *see* Pet.*,* Petitioner asserts for the first time in his Traverse that the facts as described by the California Court of Appeal are incorrect because one of the witnesses, Doe I, testified at trial that Petitioner had not molested her. Traverse at 2-3. However, the jury's guilty verdict and evidence of prior statements by Doe I that were admitted at trial support the California Court of Appeal's summary of the facts. Petitioner makes no effort to dispute this evidence. *See* Traverse. Indeed, Petitioner's own description in the Petition of the evidence introduced at trial includes evidence that supports the facts as described by the California Court of Appeal. *See* Pet. Moreover, the California Court of Appeal acknowledged in its factual summary that Doe I denied at trial that any molestation occurred. Therefore, the Court finds that Petitioner has not shown by clear and convincing evidence that the facts as described by the California Court of Appeal are incorrect.

Another time, defendant, Cristina and Doe I were in the bedroom. Doe I was told by either defendant or Cristina that he enjoyed seeing women kiss one another. Defendant told Doe I to kiss Cristina. As directed by defendant, Cristina fondled the breasts of Doe I while he watched and fondled his crotch.

There was another molestation when defendant and Doe I were parked near a movie theatre. Cristina was in the front seat of the truck and defendant with Doe I were in the rear. He touched Doe I's crotch over her clothes.

The final act of molestation happened when defendant took Doe I to the airport for her flight home. On the way, defendant stopped in a park and had sex with her before going to the airport.

As a witness during the trial, Doe I denied any and all acts of molestation by defendant. She did confirm that when she returned to Portland, she told her father that defendant had molested her. Her father contacted the Portland Police Department and Officer Charles Dune [sic] came to the house and interviewed her. She also told in a detailed interview with CARES Northwest (CARES), a county facility handling children who were sexually molested, about the various incidents with defendant. However, Doe I did get emails from Uncle Oscar and Doe I's sister that defendant financially supported the family and that the grandmother was not doing well because of the charges against him. They advised she should stop the criminal investigation. Doe I denied being influenced by the emails.

In November 2010, Doe I met the defense investigator. She confirmed defendant had sex with her. She asked about dropping the charges because she "didn't think [the charges] would destroy my family."

During the trial, Doe I said she made the allegations because she was mad at defendant. She wanted to live with Uncle Oscar and not her father. When defendant sided with her father on the issue, Doe I became mad at defendant and sought revenge.

Doe I's father and Portland Police Officer Charles Dune [sic] testified regarding her statements on the molestations by defendant; the CARES Northwest interview was played for the jury at trial.

Defendant's wife, Cristina, testified confirming the allegations of Doe I. She affirmed the incident when defendant watched the two females engage in sexual conduct at the home. She also confirmed being in the truck while parked at the movie theatre. Cristina also remembered the time when defendant told her he was taking Doe I for a short trip to the warehouse, but did not return home until two or three hours later. She further recalled their return from Disneyland. She and defendant got into an argument and he then went into Doe I's room and locked the door.

3

Case No. 15-CV-00856-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

When Doe I returned to Portland after the Disneyland-Las Vegas trip, her father, Hector, noticed she was very upset. Doe I related to her father what had happened with defendant. She told him defendant had taken her to a hotel to have sex and that his wife had touched her inappropriately. She also told him about having sex on the way to the airport.

Also, Hector had received at least two anonymous phone calls asking him if he was aware of any incidents between his daughter and defendant. Hector also noticed that defendant called the home when Hector was at work. When the anonymous caller reached Hector a second time about conduct between Doe I and defendant, Doe I's father confronted her and she related having sex with defendant. Hector recalled the specifics of what she told him.

After Hector. called Portland police, Charles Duane responded to take the information. To Duane, Doe I related the incident in the bedroom and the assault in the hotel when the two were supposed to have gone to the warehouse. Doe I did not tell Duane about the sexual improprieties on the Disneyland-Las Vegas trip. She also discussed the incident with Cristina while defendant watched.

Doe I also spoke with the CARES interviewer in Portland. This conversation was videotaped and presented during the trial. During the interview, Doe I discussed both the incident in Las Vegas with defendant and the time when he came into her bedroom and struggled with her, until interrupted by Cristina's knocking on the door. She also talked about the time defendant took her to a hotel, opening the door with an electronic key he already had and having oral, vaginal, and anal sex with Doe I against her will. Doe I also related the assault on the way to the airport for her return home.

After defendant was arrested, Doe I received emails and calls from family members, urging her to drop the case. Doe I was told to forgive him and to abandon the "craziness." All the emails were turned over to her father, Hector, who gave them to the police. While defendant's counsel objected to the emails in a motion in limine, the court believed they were admissible because they showed the effect on Doe I and her willingness to go forward as a witness.

The second victim, Doe II, was defendant's cousin. In September 2007, she was 25 years old and had recently moved to California from Nicaragua. Originally, she lived at the home of Reynaldo C., defendant's brother in California, and then with Oscar C. Oscar offered to help her obtain work at defendant's company, Casa Chicas. Doe II was hired at the company and also worked as a babysitter for defendant's young son.

On Doe II's first day of babysitting at defendant's home, she worked during the day and into the evening. Defendant came home and eventually called Doe II into the bathroom of the home. He asked her if she wanted to join him in the Jacuzzi tub. She refused. Defendant then told her he was going to sleep in his son's room that night and Doe II could use the master bedroom. She accepted the offer.

4
Case No. 15-CV-00856-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

During the night, Doe II was awakened by defendant climbing on top of her. He held her arms above her head and began forcibly kissing her, and fondling her breasts and vagina. He started rubbing his penis against her vaginal area. Doe II asked him to let go but defendant ignored her pleas. Finally, she was able to escape from the room and ran downstairs to the laundry room locking the door. He pursued her claiming nothing had happened and asking her forgiveness.

Doe II called Oscar and Amber, his wife, for help. When Oscar told her he could not pick her up, Doe II left the home of defendant and began walking to Oscar's residence, a few miles away. Along the way, Amber came upon Doe II and took her home the rest of the distance. Once home, Doe II told Amber about what defendant had done.

In the latter part of 2010, Doe II received a call from her mother in Nicaragua asking if Doe II had sent money home. Her mother forwarded to Doe II several receipts indicating payments of $90 each. Most were in Doe II's name but some were in the name of Alex C., another brother of defendant. Alex told Doe II the payments were designed to have Doe II cooperate with defendant's investigator.

The prosecution presented additional evidence concerning an uncharged rape of a victim named Carmen S. Carmen began working for defendant at Casa Chicas in 2003. In November 2003, he saw Carmen at the warehouse and offered her a ride home. While driving, defendant offered Carmen a can of soda to drink. He was drinking a similar beverage. She accepted the soda and drank it while defendant drove. As they neared her home, she blacked out. When she woke up, she was naked in a hotel room, with defendant lying next to her. Her breasts, vagina and anus were sore, and she was bleeding from her anus. Carmen got dressed and asked defendant to drive her home. As they returned to her house, defendant advised her not to discuss the events with anyone else. He told her he knew police and she could get deported. Because of the threats, she was afraid to say anything. The next day, he told her she could lose her job if she told anyone. After this incident, at various times, defendant would grope Carmen at work and make inappropriate comments about her.

Days after the incident at the hotel, defendant asked Carmen to get in his car because he needed to speak with her. He took her to the hotel and demanded sex from her. If she complied, defendant said he would bring her daughter to California from Peru.

Eventually, in December 2003, Carmen reported the events to the police. Apparently, defendant learned of her report because he came to her apartment and threatened that things would get worse if she pressed these allegations. Due to this pressure, Carmen dropped her complaint. Based on his "success" intimidating Carmen, defendant demanded and obtained sexual favors from her on subsequent occasions. She was afraid of being deported.

5

Case No. 15-CV-00856-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

> While San Pablo Police Officer Scott Cook was investigating the allegations of Doe I, he called Doe I's father, H.C., on October 23, 2007, and learned about the second victim, Doe II. Based on this information, Cook called Doe II, who had already heard about the crimes involving Doe I.

### B. Procedural History

At Petitioner's initial proceedings before the Contra Costa County Superior Court ("trial court"), Petitioner was charged with the following offenses against two victims: four counts of lewd acts upon a child under the age of fourteen (Pen. Code § 288(a); Counts 1, 7-9); three counts of forcible lewd acts upon a child (Pen. Code § 288(b); Counts 2 -5); two counts of false imprisonment by violence (Pen. Code § 236/237(a); Counts 6, 11); and one count of assault with intent to commit a felony (Pen. Code § 220(a); Count 10). Answer Ex. 1. The jury found Campos guilty on all counts. *Id*. On November 4, 2011 the trial court sentenced Petitioner to an aggregate term of 38 years to life. *Id*. at Ex. 5.

On November 4, 2011 Petitioner filed a timely notice of appeal. *Id*. at Ex. 1. On September 30, 2013, the California Court of Appeal affirmed the trial court's judgment. CCA Op. Finally, on January 15, 2014 the California Supreme Court denied petition for review. *Id*. at Exs. 7, 8.

On February 2, 2015 Petitioner filed the instant petition for habeas review. Pet. Petitioner claims the trial court violated Petitioner's right to due process under the Fourteenth Amendment by improperly admitting evidence of an alleged prior sexual offense against Carmen S. *Id*.

## II.   LEGAL STANDARD

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (2006). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court, unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision

6
Case No. 15-CV-00856-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d) (2006).  The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams v. Taylor*, 529 U.S. 362, 384–86 (2000), while the second prong applies to decisions based on factual determinations, *see Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13.  A state court decision is an "unreasonable application of" U.S. Supreme Court authority, falling under the second clause of § 2254(d)(1), if the state court correctly identifies the governing legal principle from the U.S. Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  In order to find that a state court's decision was based on "an unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record before the state court." *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) (internal quotation marks omitted).  "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant [state court] decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

The U.S. Supreme Court has repeatedly affirmed that under AEDPA, a federal habeas court must review state court decisions with a heightened level of deference. *See Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (per curiam); *Harrington v. Richter*, 131 S. Ct. 770, 783-85 (2011); *Felkner v. Jackson*, 131 S. Ct. 1305 (2011) (per curiam).  As the U.S. Supreme Court explained: "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating [state

1  court] rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" *Id.* at

2  1307 (citation omitted).  With respect to federal habeas proceedings, "[f]actual determinations by

3  state courts are presumed correct absent clear and convincing evidence to the contrary, §

4  2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual

5  determination will not be overturned on factual grounds unless objectively unreasonable in light of

6  the evidence presented in the state-court proceeding." *Miller–El*, 537 U.S. at 340.  With these

7  principles in mind regarding the standard and limited scope of review in which this Court may

8  engage in federal habeas proceedings, the Court addresses Petitioner's claims.

## III.    DISCUSSION

Petitioner claims that he was deprived of due process under the Fourteenth Amendment when the trial court admitted evidence of an uncharged sexual offense allegedly committed by Petitioner against Carmen S. in 2003.  Pet. at 8.  Petitioner argues that the testimony of Carmen S. violated Petitioner's right to due process because the uncharged conduct was "so dissimilar" to the incidents surrounding Doe I and Doe II.  *Id*. at 8, 10.  Petitioner claims this alleged error created an absence of fundamental fairness that "fatally infected the trial." *Id*. at 11 (quoting *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897 (9th Cir. 1996)).

The Petition does not specify whether Petitioner is challenging the state court's admission of the uncharged conduct as contrary to, or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts, which are the only bases upon which the Court may grant a petition for writ of habeas corpus under AEDPA.  *See* 28 U.S.C. § 2254(d); *see also* Pet.; Traverse.  Accordingly, the Court addresses each potential ground for granting the Petition in turn.

First, as to whether the trial court's admission of the uncharged conduct into evidence was contrary to, or an unreasonable application of clearly established federal law under 28 U.S.C. § 2254(d)(1), "[t]he admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).  Additionally, the Court may not grant the Petition on the

8
Case No. 15-CV-00856-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

grounds that the alleged evidentiary error constituted a due process violation if the specific error in question is "not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." *Id.* However, the U.S. Supreme Court has "not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence [under state law] constitutes a due process violation sufficient to warrant issuance of the writ." *Id.*; *see Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008) (holding that the petitioner could "point to no Supreme Court precedent establishing that admission of propensity evidence, as here, to lend credibility to a sex victim's allegations, and thus indisputably relevant to the crimes charged, is unconstitutional."), *cert. denied*, 129 S. Ct. 941 (2009). Petitioner has not cited, and the Court has not found, any cases to the contrary.

Because the U.S. Supreme Court has not held that admission of irrelevant or overtly prejudicial evidence has rendered a trial fundamentally unfair in violation of due process, Petitioner cannot show that the trial court's admission of the Carmen S. testimony was contrary to, or an unreasonable application of clearly established federal law, as stated by existing U.S. Supreme Court precedent, as necessary under 28 U.S.C. § 2254(d)(1). *See Mejia*, 534 F.3d at 1042, 1046 (holding that the state court's allegedly erroneous admission of evidence of an uncharged offense was not contrary to, or an unreasonable application of clearly established federal law because the U.S. Supreme Court had not addressed the issue); *Holley*, 568 F.3d at 1101 (holding that the state court's allegedly erroneous admissions of evidence were not contrary to, or an unreasonable application of clearly established federal law because the U.S. Supreme Court had not addressed the issue); *see also Monkres v. Campbell*, 408 F. App'x 101, 102 (9th Cir. 2011) (holding that petitioner was not entitled to habeas relief due to the admission of a prior uncharged sexual assault); *Sanches v. Hedgpeth*, 381 F. App'x 710, 711 (9th Cir. 2010) (holding that admission of two prior rape convictions during petitioner's rape trial did not violate petitioner's right to due process).

Second, to the extent Petitioner argues that the state court's admission of evidence of the uncharged conduct was based on an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2) because the uncharged conduct and charged conduct were dissimilar, Petitioner's

9
Case No. 15-CV-00856-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

argument lacks merit.  The uncharged conduct was highly similar to Petitioner's conduct regarding Doe I and Doe II.  The uncharged and charged conduct all involved allegations of sexual misconduct by Petitioner with young women under his supervision or control.  *See* CCA Op. at 2-6.  In all three circumstances the victim was a recent immigrant to the United States.  Answer, at 11:17-19.  Both Carmen S. and Doe II worked for Petitioner at Casa Chicas.  CCA Op. at 2, 15.  Likewise, Petitioner transported both Carmen S. and Doe I to hotel rooms to have sex with them.  CCA Op. at 2, 6.  Petitioner's use of drugs in the uncharged conduct does not sufficiently differentiate the uncharged conduct from Petitioner's conduct regarding Doe I and Doe II.  *See People v. Loy*, 52 Cal. 4th 46, 63 (2011) (noting that the Legislature had decided evidence of prior sexual offenses was uniquely probative and presumed admissible without focusing on the similarities required by Evidence Code §1101(b)).

Additionally, Petitioner used fear and bribery to pressure Doe I, Doe II, and Carmen S. to remain silent about Petitioner's conduct.  As to Doe I, after the incidents in Las Vegas, Petitioner told Doe I not to tell anyone because Doe I's grandmother was very sick and disclosure would make the grandmother worse.  CCA Op. at 2.  After the molestation of Doe I in the hotel room under the guise of taking a trip to the warehouse, Petitioner warned Doe I not to tell anyone because it would make her grandmother ill and that Petitioner would fire Doe I's uncle Oscar if Doe I reported the conduct.  *Id.*  After Doe I reported Petitioner's conduct to the police, Doe I received emails from her uncle Oscar and her sister telling Doe I that Petitioner financially supported the family, and that Doe I's grandmother was not doing well because of the charges against Petitioner.  *Id.* at 3.  After Petitioner was arrested, Doe I also received emails and calls from family members urging Doe I to drop the case against Petitioner.  *Id.* at 4.

Doe II was financially dependent upon Petitioner because Doe II worked for Petitioner's company Casa Chicas and also worked as a babysitter for Petitioner's young son.  *Id.* at 5.  Doe II learned from Doe II's mother in Nicaragua that money was being sent to Doe II's mother mostly in Doe II's name but sometimes in the name of Petitioner's brother Alex C.  *Id.* at 6.  Alex C. told Doe II that the payments were designed to have Doe II cooperate with the Petitioner's investigator.

*Id.*

Carmen S. was financially dependent upon Petitioner because she worked for Petitioner's company Casa Chicas. *Id.* After Petitioner drugged and raped Carmen S., Petitioner advised Carmen S. not to discuss the events with anyone else and told Carmen S. that Petitioner knew police and Carmen S. could get deported. *Id.* The next day, Petitioner told Carmen S. that Carmen S. could lose her job if she told anyone. *Id.* Days later, Petitioner demanded sex from Carmen S. and said Petitioner would bring Carmen S.'s daughter to California from Peru if Carmen S. complied. *Id.* After Carmen S. reported Petitioner's conduct to the police, Petitioner learned of the report, came to Carmen S.'s apartment, and threatened that things would get worse if Carmen S. pressed these allegations. *Id.*

Any differences between Doe I, Doe II, and Carmen S. are not sufficiently significant to constitute "clear and convincing evidence" that the court's admission of testimony regarding the uncharged conduct was unreasonable. *See Miller–El*, 537 U.S. at 340. For the foregoing reasons, the trial court did not make an "unreasonable determination of the facts" in concluding that the relevance of the Carmen S. testimony outweighed any potentially prejudicial effect. *See* 28 U.S.C. § 2254(d).

Finally, even if admission of the Carmen S. testimony were a due process violation, "habeas relief is only available if the constitutional error had a 'substantial and injurious effect or influence' on the jury verdict or trial court decision." *Garcia v. Long*, 808 F.3d 771, 781 (9th Cir. 2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). In the instant case, there was overwhelming evidence to support the jury verdict, such that any error with regard to the admission of evidence of uncharged conduct did not have a "substantial and injurious effect or influence" on the jury verdict. For example, Doe I's videotaped interview with CARES Northwest ("CARES") firmly supports the jury verdict regarding allegations as to Doe I. In the CARES interview, which was admitted into evidence, Doe I described Petitioner taking Doe I to a hotel and having sex with her, as well as two other instances in which Petitioner molested Doe I. CCA Op. at 3-4. Doe I's interview with the Portland police likewise supports the allegations as to

Doe I. *Id*. Furthermore, many of the alleged incidents regarding Doe I were confirmed by the testimony of Petitioner's wife. *Id*. at 4. Additionally, Petitioner has not challenged the testimony provided by Doe II, which strongly supports the jury verdict regarding allegations as to Doe II. *Id*. at 16. Doe II testified that while staying at Petitioner's house, Petitioner entered the room Doe II was sleeping in and attempted to molest her. *Id.* at 5. In the face of the overwhelming evidence supporting the jury verdict, Petitioner has not explained how the Carmen S. testimony improperly affected the jury. Petitioner merely states that "there [was] no way a reasonable jury could have ignored her prejudicial testimony." Pet. at 10. Such conclusory allegations are insufficient to meet the standard for habeas relief. *Roettgen v. Ryan*, 639 F.Supp.2d 1053, 1065 (C.D. Cal. 2009) (concluding that because the evidence against the petitioner was of such strength, the admission of evidence that petitioner had previously molested a young boy did not have a substantially injurious effect on the jury).

For the reasons mentioned above, Petitioner's right to due process was not violated by the trial court's admission of the Carmen S. testimony.

## IV. CONCLUSION

Petitioner's petition for writ of habeas corpus is DENIED.

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling. *See* Rule 1 1(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. Petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). Accordingly, a COA is DENIED.

The Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: June 20, 2016

_Lucy H. Koh_
LUCY H. KOH
United States District Judge